UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

MARY ANN COOK,

     Plaintiff,

v.                                    Case No. 3:17cv254-CJK

NANCY A. BERRYHILL, Acting
Commissioner of the Social Security
Administration,

     Defendant.

_____/

## MEMORANDUM ORDER

This matter is before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Mary Ann Cook's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-34. The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c) and FEDERAL RULE OF CIVIL PROCEDURE 73 for all proceedings in the case, including entry of final judgment. Upon review of the record before the court, I conclude the findings of fact and determinations of the Commissioner are supported by substantial evidence. The decision of the Commissioner, therefore, will be affirmed and

plaintiff's application for benefits will be denied.

## ISSUES ON REVIEW

Ms. Cook, who will be referred to as claimant, plaintiff, or by name, raises 3 issues on appeal. She argues the ALJ erred in (1) evaluating her credibility; (2) not fully considering the combined effect of her impairments, including obesity; and (3) relying on the vocational expert's definition of "low stress work environment" in determining her residual functional capacity ("RFC") and finding her capable of other work existing in the national economy.

## PROCEDURAL HISTORY

Ms. Cook filed an application for DIB on March 20, 2014, alleging disability beginning November 5, 2013, due to a hernia, high blood pressure, high cholesterol, diabetes, kidney problems, a torn ACL, sciatic nerve problems, and pancreatitis. T. 46, 216.[1] Her claim was denied initially and on reconsideration. T. 122-25, 132-36. Ms. Cook appeared for a hearing before an Administrative Law Judge ("ALJ") on January 7, 2016. T. 43-99. On February 24, 2016, the ALJ issued a decision denying Ms. Cook's application for benefits. T. 22-42. Ms. Cook petitioned the Appeals

---

[1] The administrative record, as filed by the Commissioner, consists of 13 volumes (docs. 13-1 through 13-13) and has 810 consecutively numbered pages. References to the record will be by "T.," for transcript, followed by the page number.

Council for review of the ALJ's decision. T. 14. The Appeals Council denied the request. T. 1-5. The ALJ's decision thus became the final determination of the Commissioner.

## FINDINGS OF THE ALJ

In his written decision, the ALJ made a number of findings relevant to the issues raised in this appeal:

- "The claimant meets the insured status requirements of the Social Security Act through December 31, 2018." T. 27.

- "The claimant has not engaged in substantial gainful activity since November 5, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*)." T. 27.

- "The claimant has the following severe impairments: diabetes mellitus; hypertension; gastroesophageal reflux disease; obesity; major depressive disorder, recurrent, severe with psychotic features; hyperlipidemia; post-traumatic stress disorder; degenerative disc disease of the lumbar spine; gastritis; pancreatitis; and asthma (20 CFR 404.1520(c))." T. 27.

- "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the

listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." T. 28.

- "[C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she can lift/carry and push/pull 10 pounds frequently and 20 pounds occasionally. She can sit for 6 hours out [of] an 8-hour workday, stand for 6 hours out of an 8-hour workday, and walk for 6 hours out of an 8-hour workday, but must be able to change position at will from sitting, standing, and walking. She can frequently stoop, kneel, crouch, and climb ramps or stairs. She can never crawl or climb ladders or scaffolds. She can frequently work around unprotected heights and moving mechanical parts. She can occasionally work around dust, odors, fumes, and pulmonary irritants. She is limited to performing simple, routine tasks and making simple work-related decisions. She can frequently respond appropriately to supervisors, co-workers, and the public. She is limited to tolerating few changes in a routine work setting defined as a low stress work environment." T. 30.

- "The claimant is unable to perform any past relevant work (20 CFR 404.1565)." T. 35.

- "Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a) and 404.1568(d))." T. 36.

- "The claimant has not been under a disability, as defined in the Social Security Act, from November 5, 2013, through the date of the decision (20 CFR 404.1520(g))." T. 37.

## STANDARD OF REVIEW

A federal court reviews the "Commissioner's decision to determine if it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consol.*

*Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (*quoting Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

When reviewing a Social Security disability case, the court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)); *see also Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 822 (11th Cir. 2015) ("In determining whether substantial evidence supports a decision, we give great deference to the ALJ's factfindings.") (*citing Black Diamond Coal Min. Co. v. Dir., OWCP*, 95 F.3d 1079, 1082 (11th Cir. 1996)). A reviewing court also may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). Review is deferential to a point, but the reviewing court conducts what has been referred to as

"an independent review of the record." *Flynn v. Heckler*, 768 F.2d 1273 (11th Cir. 1985).[2]

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A). To be eligible for disability benefits, a claimant must prove she became disabled prior to the expiration of her date last insured. *See* 42 U.S.C. §§ 416(i)(3), 423(a) and (c); 20 C.F.R. §§ 404.101, 404.130, 404.131; *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

Pursuant to 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the Commissioner analyzes a disability claim in 5 steps:

_____

[2] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

1.  If the claimant is performing substantial gainful activity, she is not disabled.

2.   If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.  If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least 12 months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.  If the claimant's impairments do not prevent her from performing past relevant work, she is not disabled.[3]

5.  Even if the claimant's impairments prevent her from performing past relevant work, if other work exists in significant numbers in the national economy that accommodates the claimant's residual functional capacity and vocational factors, she is not disabled.

Step 5 (or step 4 in cases in which the ALJ decides a claimant can perform past work) is generally where the rubber meets the road.  At that point, the ALJ formulates

---

[3] Claimant bears the burden of establishing a severe impairment that keeps her from performing past work.  *Chester v. Bowen*, 792 F. 2d 129, 131 (11th Cir. 1986).

the all-important residual functional capacity. The ALJ establishes RFC, utilizing the

impairments identified at step 2, by interpretation of (1) the medical evidence; and (2)

the claimant's subjective complaints (generally complaints of pain). Residual

functional capacity is then used by the ALJ to make the ultimate vocational

determination required by step 5.[4] "[R]esidual functional capacity is the most [a

claimant] can still do despite [claimant's] limitations."[5] 20 C.F.R. §§ 404.1545(a)(1),

416.945(a)(1). Often, both the medical evidence and the accuracy of a claimant's

---

[4] "Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.) We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps." 20. C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[5] In addition to this rather terse definition of RFC, the Regulations describe how the Commissioner makes the assessment:

> (3) Evidence we use to assess your residual functional capacity. We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity. (See § 416.912(c).) However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources. (See §§ 416.912(d) through (f).) We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. (See § 416.913.) We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends or other persons. (See paragraph (e) of this section and § 416.929.)[.]

20 C.F.R. § 416.945(a)(3).

subjective complaints are subject to a degree of conflict and that conflict leads, as in this case, to the points raised on judicial review by the disappointed claimant.

## FACT BACKGROUND[6]

Ms. Cook was born on September 13, 1961, and was 52 years old on the alleged onset date of November 5, 2013.  T. 47, 185.  She is approximately 5 feet, 1 inch tall and weighed 232 pounds at the time of the hearing.  T. 47.  She has a high school education, completed 2 years of college, and received a correctional diploma.  T. 48, 217.  She has past relevant work as a corrections officer and security guard.  T. 50-51, 82, 217.  Ms. Cook alleged disability due to a hernia, high blood pressure, high cholesterol, diabetes, kidney problems, a torn ACL, sciatic nerve problems, and pancreatitis.  T. 216.

At the hearing, Ms. Cook said she quit working as a correctional officer because she "was having too much pain."  T. 50.  She also "couldn't control [her] diabetes," "was throwing up a lot," and "had to go to the bathroom a lot."  T. 50.  She "worked a lot in the towers, and it was getting hard for [her] to even climb up in the towers.  The problems with [her] walking was stubbing up [her] back and [she] was

---

[6]  The medical and historical facts of this case, as set out below, were derived primarily from plaintiff's testimony at the hearing and also the administrative record.

throwing up convulsively." T. 50.  Ms. Cook said "[t]hey did not want [her] to bring

. . . any kind of medication on ground.  And it would be hard to, like, climb out of the

towers to go and – and – and then, it got really, really bad where [she] was having to

have shots.  So, [she] couldn't bring those in either." T. 50-51.  Ms. Cook asked for

an accommodation and "was told that [she] could go out to [her] car and take shots

or whatever," but "a lot of times, [she] – [she] ended up having to call an ambulance

a couple times to come and pick [her] up because [she] couldn't breathe. [She] was

just having a lot of problems." T. 51.  She thus quit her job.  T. 51.

When asked why she feels she is unable to work, Ms. Cook said "[m]y – my

back for one thing.  It gets terribly knotted up.  I mean, I'm already in pain when I'm

– when I'm sitting down." T. 54.  She explained when she "start[s] to walk, it starts

to knot up towards the backend of [her] back, and it gets worse.  And it gets so bad

that [she has] – when [she has] tried to walk through – through Walmart because [she]

– [she] was concerned about her weight.  But, [she] ended up having to get somebody

to bring [her] a wheelchair to – the wheelchair, in order to finish up." T. 54.  "That

and [her] – [her] diabetes is – is out of control. [She was] trying to get them under

control." T. 54.  The ALJ asked Ms. Cook what she was doing to try to get her

diabetes under control, and Ms. Cook responded "I'm trying with different medicines, and I'm trying to keep an eye on my diet, and try to keep the carbohydrates down low." T. 54. She continued "I – I've got diabetic nerve pain and fibromyalgia, both. And I'm in – I'm in constant pain. Sometimes I have problems breathing." T. 54. Ms. Cook said she is "supposed to have COPD" and was prescribed an asthma inhaler a while back. T. 54-55.

When asked about throwing up, Ms. Clark said she had not "throwed up in at least a month." T. 57. No doctor had explained why she threw up, but "whenever [she] was put in the hospital, they did say something about gastrointestinitis [phonetic] or something like that. And he had said that there was a – a lot of – what do they call them? Anyway, he put me on some medicine because he said that there were more lumps in my stomach than there should be." T. 57. Ms. Cook took over-the-counter medication that helped. T. 57-58. The ALJ also asked about Ms. Cook's frequent urination. Ms. Cook said she has "had problems since [she] was – ever since [she] was little with [her] kidneys," but she is pretty sure the current problem of having to urinate every 30 minutes to an hour is a result of diabetes, which the doctors have told her she needs to try to control. T. 58-59.

Ms. Cook wears back and knee braces.  T. 59.  She has "an old torn ACL that every now and then pops out of place, so [she] wear[s] a knee brace, especially whenever it's been – been doing it for a little bit.  Because whenever it pops out, it hurts like heck."  T. 58.  She also uses a cane to "help . . . steady [herself] to where [she does not] fall."  T. 59.  The back brace was not prescribed, but it helps with the pain.  T. 60.  And the cane, which also was not prescribed, "helps [her] a big deal in falling on [her] face."  T. 61.  She has been told to use ice packs.  T. 61.  She also has had cortisone shots in her back.  T. 61.  "Here recently, since [she does not] have any insurance and [she is] having to go to the Health Department, [she] can't get any – any Lortabs or anything like that. [She] was getting Lortabs when [she] was working."  T. 61.  She also used Salonpas and "quite a lot of Tylenol  because [she] can't – [she] can't get anything else.  The Health Department won't let [her] have it" because the doctors are not allowed to prescribe pain medication.  T. 61.

Ms. Cook said she started experiencing anxiety "whenever [she] knew that [she] had a problem and [she] was trying to work and knowing that [she] wasn't able to work."  T. 62.  "And then, through the pain – because of the pain, [she] wasn't able to sleep.  So, that was causing problems too.  And on top of that – because of that,

[she] was having depression. And because of that and some deaths in the family, so it – it was all kind of compounded." T. 62. When she is anxious, she does not "really want to be around people. It's hard for [her] to breathe." T. 62-63. She also cries as lot. T. 63. She last was anxious approximately 7 months before the hearing, when her niece died. T. 63. Ms. Cook thinks stress triggers the anxiety. T. 63. When asked whether medication helped with anxiety and depression, Ms. Cook said "the medicine they've been giving me has been doing really good with the depression. It's been – it helped me a lot more whenever they added the Abilify." T. 63-64. She nevertheless "sometimes still [has] the depression and crying and stuff like that. . . . But, for the most part, the – the medicine that they're giving me has – has been working." T. 64. Ms. Cook was not aware of any side effects. T. 64.

Ms. Cook testified that when she gets up in the morning, she prepares breakfast and takes care of her 4 chihuahuas. T. 64. She does not do much housework. T. 65. She tries to sweep the kitchen floor, but "can only get halfway." T. 65. On at least one occasion, her "back hurt . . . so bad, [the friend who lives with her] ended up having to finish it up." T. 65. She does laundry, but not dishes. T. 65. She shops for groceries once a month, when she receives food stamps. T. 65-66. When at Walmart, she uses an electrical cart. T. 65-66. The only other time she leaves the house is to

visit her mother, which she tries to do at least once a week.  T. 66.  She watches

television "[a]bout five hours" a day.  T. 67.  She reads "[e]very now and then," and

she searches the internet "no more than about an hour a day."  T. 67.  She lies down

for half an hour to an hour twice each day to relieve back pain.  T. 79.  Ms. Cook said

she cannot stand or walk more than 1 hour a day.  T. 80.

A vocational expert, Jack Thomas, also testified at the hearing.  T. 82.  For his

first hypothetical, the ALJ asked Mr. Thomas to assume an individual of Ms. Cook's

age, education, and work history who would be limited to light work and could

frequently climb ramps and stairs; never climb ladders or scaffolds; frequently stoop,

kneel, and crouch, but never crawl; and frequently work at unprotected heights and

around moving mechanical parts, but only occasionally work around dust, odors,

fumes, and pulmonary irritants.  T. 82-83.  The ALJ asked Mr. Thomas whether such

an individual could perform any of Ms. Cook's past work.  T. 83.  Mr. Thomas said

such an individual could be a security guard.  T. 83.

For the second hypothetical, the ALJ added "[t]he person would need to be able

to change position at will from sitting, standing, and walking.  In addition, the person

would need access to a bathroom as opposed to being at a remote job site or some

other worksite where you don't have access."  T. 83-84.  The ALJ then asked "[w]ith

those additional limitations, could the hypothetical person still perform the job of a security guard?" T. 84. Mr. Thomas responded "I would think that the situation for the security guard position would be limited, Your Honor. There would be – because of the walking of the rounds and the person really doesn't have the opportunity to change from sitting to standing and walking, other than maybe in a gate guard sort of situation. And usually the gate guard jobs do have restrooms in the – the island they work in, Your Honor. But, that's not 100%." T. 84. Upon further questioning by the ALJ, Mr. Thomas said such an individual would not be able to perform the job of security guard because of having to make rounds and lack of access to a restroom but could perform the jobs of surveillance system monitor; cutter and paster, press clippings; marker; router; and silver wrapper. T. 84-85.

For the third hypothetical, the ALJ asked Mr. Thomas to "assume all the same limitations as the first two hypotheticals with the following additional limitations. For mental limitations, the person would be limited to tolerating few changes in a routine work setting defined as working in a low-stress work environment." T. 86. Mr. Thomas responded the silver wrapper job "is relatively low stress" and "[t]here's no temperament for handling stress or having a – it is a repetitive job, having a – to meet quotas or anything like that. . . . marker also repetitive." T. 86. The ALJ

clarified he had not yet asked about simple, repetitive tasks and had asked only about low stress, and Mr. Thomas explained he "was just saying that it doesn't have the S factor, for example, and . . . doesn't have, you know, trying to – to influence people or something like that, those sorts of things. That's basically what I was doing to rule out stress, Your Honor. And those two jobs, the – the individual does not have the responsibility of dealing with public, the public. So – and usually they're just left to go ahead and do – take care of what they need to take care of." T. 87. The ALJ asked Mr. Thomas to identify a third job, and Mr. Thomas said "advertising material distributor." T. 87.

The ALJ posed a fourth hypothetical, adding "[t]he person would have social limitations. She'd be limited to only frequently working – so two-thirds of the day, with supervisors, coworkers, and the public." T. 87. Mr. Thomas said that with the additional limitation, "[i]t's no longer a low-stress job, generally speaking," and the hypothetical individual could not perform the jobs identified. T. 88. The ALJ asked whether there would be other work the person could perform. T. 88. Mr. Thomas responded "I would think that there would be an erosion of the occupational base away, Your Honor, where this individual would not be able to have work that could be done." T. 88. The ALJ asked whether there were "low-stress jobs under the

previous hypotheticals where also they have limited contact with the public and coworkers." T. 88-89. Mr. Thomas responded "the jobs that I gave you had limited contact with the public and coworkers and supervisors." T. 89. The ALJ said "I guess the way I should have said it was no more than two-thirds of the time. So, zero time also qualifies." T. 89. Mr. Thomas said "the jobs would still be available to the individual. . . . [T]hey generally do not have contact with the public. Supervisors do not bother them. They're usually left to go ahead and take care of what they need to take care of. The coworkers really don't have a need to talk with them about what they're doing." T. 89.

For the fifth hypothetical, the ALJ limited the person to performing only simple, routine tasks and making only simple, work-related decisions. T. 89-90. Mr. Thomas said such an individual could perform the jobs of marker, silver wrapper, and advertising material distributor. T. 90.

Finally, for the sixth hypothetical, the ALJ asked Mr. Thomas to "reduce the exertional level to the range of sedentary work." T. 90. Mr. Thomas said "[t]hat would eliminate the jobs that I've given you because they're all light work," but such an individual could be a cutter and paster, press clippings. T. 90.

ANALYSIS

1.    Credibility Determination

Plaintiff first challenges the ALJ's credibility determination.  A claimant who attempts to prove disability based on subjective complaints must provide evidence of an underlying medical condition and either objective medical evidence confirming the severity of her alleged symptoms or evidence establishing her medical condition could reasonably be expected to give rise to the alleged symptoms.  *See* 20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b); SSR 96-7p; *Wilson*, 284 F.3d at 1225-26.  If the objective medical evidence does not confirm the severity of the claimant's alleged symptoms but the claimant establishes she has an impairment that could reasonably be expected to produce the symptoms alleged, the ALJ must evaluate the intensity and persistence of the claimant's alleged symptoms and their effect on claimant's ability to work.  *See* 20 C.F.R. §§ 404.1529(c), (d) 416.929(c), (d); SSR 96-7p; *Wilson*, 284 F.3d at 1225-26.  Notably, in determining whether substantial evidence supports an ALJ's credibility determination, "[t]he question is not . . . whether [the] ALJ could have reasonably credited [claimant's] testimony, but whether the ALJ was clearly wrong to discredit it."  *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

Case No. 3:17cv254-CJK

Here, the ALJ found Ms. Cook not entirely credible because of her "[i]nconsistent reports and testimony" and "the fact that the record contains observations of generally stable examination findings and significant non-compliance with medical instruction regarding her diet and medications." T. 35. The ALJ's reasons for discounting plaintiff's credibility are supported by substantial evidence in the record. Although the medical findings may provide an objective basis for some of plaintiff's impairments and other symptoms, they do not reflect symptoms of disabling severity. For instance, as the ALJ noted, in May 2013, 6 months prior to the alleged onset date, Ms. Cook reported to the emergency room with abdominal pain, nausea, and vomiting; testing revealed she had pancreatitis. T. 32, 296. The doctor prescribed medication, and Ms. Cook reported her pain was well controlled. T. 296. The exam revealed no apparent distress, no neurological deficits, and no psychiatric abnormalities. T. 314. Ms. Cook reported no back pain, joint pain, or extremity pain. T. 545. Her spine was non-tender, and she had normal range of motion, no swelling, and normal orientation. T. 546. The doctor prescribed insulin and noted "[h]er blood sugars were fairly well controlled." T. 358.

After the alleged onset date, in March 2014, plaintiff was able to walk with a normal gait despite complaints of back pain and trouble walking. T. 369-70. The

following month, she had a normal gait, was in no distress, and had no signs of psychiatric illness. T. 471-72. In May 2014, Ms. Cook's spine appeared normal, and she had an appropriate mood with no anxiety or depression. T. 388. Ms. Cook returned to the emergency room the same month with reports of chest pain and abdominal pain, but her abdomen was non-tender, her back was normal with no tenderness, she had normal range of motion and motor strength in the extremities, and her neurological exam, affect, and judgement were normal. T. 500, 594.

In July 2014, Ms. Cook had no joint abnormalities or swelling, full range of motion in the extremities, and normal muscle strength. T. 696. She also had an appropriate mood and affect with no gross motor dysfunction. T. 696. The next month, Ms. Cook reported improved anxiety with medication. T. 620. She had only a slightly depressed mood, good eye contact, normal speech, normal thoughts, full orientation, and fair attention and concentration. T. 620. In November 2014, Ms. Cook presented with a walking cane that was not prescribed. T. 677. She had good strength in the lower extremities. T. 677. Shortly thereafter, she reported significant psychological improvement with medication. T. 614.

In February 2015, Ms. Cook denied muscle or joint problems, muscle pain, and swelling. T. 659. Her musculoskeletal system was "Normal." T. 659. She had full

range of motion in the extremities and normal muscle strength. T. 663. Ms. Cook's mood and affect were appropriate. T. 663. In April 2015, Ms. Cook reported she was doing fairly well on her current medication. T. 607. She had a good mood, constricted affect, full orientation, fair attention and concentration, unremarkable speech, and normal thoughts. T. 607. Over the next couple of months, Ms. Cook reported she was doing well with her medications and was not experiencing any side effects. T. 605-06. She had normal mood and affect, good eye contact, normal speech, organized thoughts, fair attention and concentration, and normal orientation. T. 605-06.

In October 2015, Ms. Cook's mood and affect were appropriate and she had no motor dysfunction. T. 762. The following month, Ms. Cook reported she had "a good quality of life" and her medications were "very effective for treating her symptoms." T. 776. The doctor found Ms. Cook "very pleasant and forthcoming in discussing her medications and symptoms." T. 776.

Given the minimal objective findings and conservative treatment reflected in the record, the undersigned cannot conclude the ALJ was clearly wrong in assessing plaintiff's credibility. Although Ms. Cook testified to severe limitations that preclude

her from working, there simply is no indication in the record Ms. Cook suffers from any condition precluding her from working at the prescribed RFC.

Ms. Cook's lack of compliance with treatment supports such finding. *See* 20 C.F.R. §§ 404.1527(d)(4), 404.1529(c)(3)(iv)-(vi); *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) ("We have held that 'refusal to follow prescribed medical treatment without good reason will preclude a finding of disability'" (*citing Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988)); *Jacobus v. Comm'r of Soc. Sec.*, 664 F. App'x 774, 777 (11th Cir 2016) (holding that the ALJ properly relied on the claimant's failure to comply with treatment as support for his decision). As the ALJ noted, Ms. Cook failed, over the course of her treatment, to comply with repeated counseling regarding diet and medication. T. 32-33. In July 2014, Ms. Cook reported she felt better taking medication and "admit[ted] much dietary indiscretion with carbohydrates." T. 683. Pursuing her diabetes treatment, she met with a nurse who urged her to decrease carbohydrate intake. T. 689. She again was urged to decrease carbohydrates in August 2014. T. 681. As of November, Ms. Cook's diabetes remained uncontrolled. T. 673. She had "poor diet understanding" and failed to present a food log, as she had been instructed to do. The doctor counseled Ms. Cook on carbohydrates and told her bring a log to her next visit. T. 673.

Ms. Cook's condition remained essentially the same in January 2015.  T. 669.

The nurse noted "very poor control," and plaintiff admitted a poor diet.  T. 669.  The

following month, Ms. Cook admitted she was not following a diabetic diet and was

eating "alot of fried foods and carbs daily."  T. 658.  She acknowledged a "horrible

diet" due to "bad habits."  T. 658, 665.  She "ha[d] a plan after extensive motivational

interviewing to measure her rice and potatoes using a spoon, and agree[d] to try to cut

down on carbs, but [she] could not be more specific . . . than this."  T. 658.  She also

refused to meet with a nurse to discuss dietary issues.  T. 665.

In March 2015, Ms. Cook reported she was not motivated to improve her diet

or cooking.   T. 656.   In April 2015, Ms. Cook's doctor reported she was

noncompliant with medication and "self-changing insulin."  T. 649.  The doctor

reviewed with Ms. Cook "in detail" the need for compliance.  T. 649.  In June 2015,

however, Ms. Cook still was not using insulin properly.  T. 641.  She could not state

how often she used it, and she admitted her diet was poor and consisted of potatoes

and fried food.  T. 641.  Ms. Cook again admitted to "not eating correctly" in

September 2015, stating she consumed "a lot of potatoes, rice, and other carbs;" she

also again refused dietary education.   T. 764.   In December 2015, Ms. Cook

"admit[ted] to a very poor diet, eating candy and pie and not carrying her meds with her." T. 792.

Ms. Cook plainly was not compliant with her doctors' instructions. Although the record reveals no complications as a result of diabetes, Ms. Cook, by self-diagnosis perhaps, testified to a number of symptoms she attributed to diabetes. T. 54, 58-59, 69-70, 73, 797. As indicated above, Ms. Cook's failure to follow her doctors' recommendations, particularly in light of purported symptoms attributed to diabetes, provides additional evidence supporting the ALJ's finding her condition was not of the severity claimed. *See* 20 C.F.R. §§ 404.1527(d)(4), 404.1529(c)(3)(v), (vi); *Ellison*, 355 F.3d at 1275; *Jacobus*, 664 F. App'x at 777. The ALJ thus did not err in finding Ms. Cook's statements regarding the intensity, persistence, and limiting effects of her symptoms not entirely credible. *See* 20 C.F.R. §§ 404.1529(c)(3), 404.1545(a)(3), 416.929(c)(3), 416.945(a)(3); SSR 96-6p; SSR 96-7p; *T.R.C., ex rel. Boyd v. Comm'r, Soc. Sec. Admin.*, 553 F. App'x 914, 917-18 (11th Cir. 2014); *Cooper v. Comm'r, Soc. Sec. Admin.*, 521 F. App'x 803, 807 (11th Cir. 2013).

Plaintiff argues the ALJ should not have relied on her failure to comply with treatment without exploring the reasons she failed to comply, including potential side effects, confusion, and finances. Plaintiff testified at the hearing she took medication

and did not experience side effects. T. 57-58, 64. Moreover, the medical records indicate plaintiff's treatment was effective when she complied. T. 605-06, 614, 618, 683. Ms. Cook herself attributed noncompliance with dietary restrictions to bad habits and lack of motivation. T. 656, 658, 665. There is no indication she did not understand the importance of changing her diet. With regard to finances, the undersigned struggles to understand how financial difficulties prevented Ms. Cook from complying with doctors' orders regarding simple dietary and lifestyle changes. Nevertheless, the ALJ is required to consider affordability of treatment only when a lack of treatment is the primary basis for an adverse credibility finding. *See Ellison*, 355 F.3d at 1275 (holding that an ALJ must consider excuses for noncompliance only when it is the "sole ground for the denial of disability benefits"). Here, the ALJ did not deny benefits based solely on Ms. Cook's noncompliance. Instead, the ALJ considered plaintiff's noncompliance together with the other evidence of record in finding plaintiff's complaints of severity not fully credible. The ALJ's decision in that regard is supported by substantial evidence in the record.

B.     Combination of Impairments/Obesity

Plaintiff next argues the ALJ erred in failing to adequately take into account the aggregate impact of her severe impairments, including obesity. "Where a

disability claimant has alleged several severe impairments, the Secretary has a duty to consider the impairments in combination and to determine whether the combined impairments render the claimant disabled." *Jones v. Dep't of Health and Human Servs.*, 941 F.2d 1529, 1533 (11th Cir. 1991); *see also Jones v. Bowen*, 810 F. 2d 1001,1006 (11th Cir. 1986) ("It is now well settled that the ALJ must consider the combined effects of a claimant's impairments in determining whether he is disabled."). The Eleventh Circuit found the following statement sufficient to demonstrate the ALJ satisfied his obligation in that regard: "based upon a thorough consideration of all evidence, the ALJ concludes that [claimant] is not suffering from any impairment, *or a combination of impairments* of sufficient severity to prevent him from engaging in any substantial gainful activity for a period of at least twelve continuous months." *Wheeler v. Heckler*, 784 F.2d 1073, 1076 (11th Cir. 1986).

In this case, the ALJ found obesity to be a severe impairment, specifying plaintiff's height, weight, and body mass index. He also found a number of other severe impairments. And he expressly stated Ms. Cook "does not have an impairment *or combination of impairments* that meets or medically equals the severity of one of the listed impairments." R. 28 (emphasis added). The ALJ thus plainly considered the combination of Ms. Cook's impairments, including obesity, and made sufficient

findings regarding the effect thereof. *See Wilson*, 284 F.3d at 1224-25. Even if he had not, plaintiff has wholly failed to explain how additional consideration of the combination of impairments would lead to a finding of disability.[7] Ms. Cook therefore has not shown the ALJ erred in considering the combined effect of her impairments.

## C. Vocational Expert Testimony

As her last assignment of error, Ms. Cook urges the ALJ impermissibly relied on the vocational expert's definition of "low stress work environment" in determining RFC and that there were jobs existing in significant numbers in the national economy Ms. Cook could perform. According to Ms. Cook, the ALJ was required to conduct a subjective inquiry into job attributes that would cause her stress rather than an objective inquiry into job stressors in general. In support of her position, Ms. Cook relies on the Eleventh Circuit's decision in *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176 (11th Cir. 2011). In that case, the Eleventh Circuit held that an ALJ's hypothetical question must account for a claimant's moderate limitations in

---

[7] Plaintiff argues the ALJ erroneously gave significant weight to the opinion of state agency medical consultant James Patty, M.D., in connection with the ALJ's consideration of obesity and/or determination plaintiff did not have a combination of impairments that met or medically equaled the severity of one of the listed impairments. The ALJ, however, considered Dr. Patty's opinion in determining plaintiff's RFC, not in connection with obesity or the combined effect of plaintiff's impairments.

concentration, persistence, and pace. *Id.* at 1180-81. Although the court held an ALJ generally cannot account for such limitations simply by limiting the claimant to simple, routine tasks or unskilled work, "when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace . . . limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations." *Id.* at 1181; *see Neefe v. Comm'r of Soc. Sec.*, 531 F. App'x 1006, 1007 (11th Cir. 2013) (holding the "ALJ accounted for [claimant's] limitations in concentration, persistence, or pace by considering and posing to the vocational expert that [claimant] could perform only simple tasks in a low stress environment with only limited contact with the public"); *Scott v. Comm'r of Soc. Sec.*, 495 F. App'x 27, 29 (11th Cir. 2012) (holding a hypothetical question limiting claimant to "low stress, simple, unskilled; one, two, or three step instructions" accounted for claimant's moderate mental limitations); *Syed v. Comm'r of Soc. Sec.*, 441 F. App'x 632, 635 (11th Cir. 2011) (holding a hypothetical limiting claimant to a "low-stress work environment" implicitly accounted for claimant's moderate mental limitations).

Here, the ALJ found Ms. Cook had moderate restriction or difficulties in activities of daily living; social functioning; and concentration, persistence, and pace.

T. 28. The ALJ noted that although Ms. Cook's mental health records show complaints of trouble with concentration, Ms. Cook's "attention and concentration were consistently fair upon mental status exams." T. 28. Ms. Cook also testified she watches television for 5 hours a day, reads, and uses a computer. T. 28. In his hypothetical, the ALJ limited the individual to performing only simple, routine tasks; making only simple, work-related decisions; working around supervisors, coworkers, and the public only two-thirds of the day; and tolerating few changes in a routine work setting. In so doing, the ALJ adequately accounted for plaintiff's mental limitations.

Even if the ALJ had not adequately accounted for Ms. Cook's mental limitations, Ms. Cook has not demonstrated error because she has not shown she cannot perform the jobs the vocational expert identified. In *Chambers v. Comm'r of Soc. Sec.*, 662 F. App'x 869, 872-73 (11th Cir. 2016), the claimant argued the ALJ erred in relying on the vocational expert's testimony because the jobs identified did not accommodate the restriction to simple work and a low stress environment. The Eleventh Circuit rejected claimant's argument noting the claimant did not present any evidence the jobs identified were inconsistent with the ALJ's hypothetical. *Id.*

Plaintiff thus has failed to show the ALJ erred with regard to the hypothetical posed to the vocational expert.

CONCLUSION

In sum, although the record shows Ms. Cook suffers from impairments, there is no evidence any such impairment renders her unable to work at the light exertional level with the limitations the ALJ imposed. The Commissioner's decision is supported by substantial evidence in the record and application of the proper legal standards and thus should be affirmed.[8] *See Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").

**ACCORDINGLY it is ORDERED:**

1.     The decision of the Commissioner is AFFIRMED and plaintiff's application for Disability Insurance Benefits is DENIED.

2.     The clerk shall enter judgment for defendant and close the file.

---

[8] The court notes that, to the extent it reviewed the legal principles upon which the ALJ's decision is based, it conducted a *de novo* review. *See Gilson v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

Case No. 3:17cv254-CJK

**DONE and ORDERED** this 28th day of September, 2018.

/s/ *Charles J. Kahn, Jr.*

**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**